1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VICTORIA RYAN,<br><br>                                  Plaintiff,<br>        v.<br><br>EDITIONS LIMITED WEST, INC., ET AL.,<br><br>                                  Defendants. | Case No.: C-06-04812 PSG<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW AFTER<br>BENCH TRIAL** |

## I. INTRODUCTION

This is a copyright infringement action brought by Plaintiff Victoria Ryan ("Ryan") against Defendant Editions Limited West, Inc. ("ELW"). Ryan is an artist working in pastel on paper and ELW is authorized to publish, distribute and sell certain of Ryan's paintings as posters. Defendant ArtSelect, Inc. ("ArtSelect") is a retailer of artwork. Ryan claims that ELW authorized and encouraged retailers like ArtSelect to sell derivative works of the posters without her permission.

Ryan originally brought claims for copyright infringement, unfair competition, breach of contract, and slander of title.[1] On June 4, 2009, the court granted summary judgment to ELW on each of Ryan's claims.[2]

_____

[1] *See* Docket No. 1.

[2] *See* Docket No. 142.

1

Case No.: C 06-4812 PSG
ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ryan then appealed the grant of summary judgment, as well as various discovery rulings.[3] On March 3, 2011, the Ninth Circuit issued a single opinion addressing all issues before it.[4] The appellate court affirmed the summary judgment on Ryan's breach of contract, unfair competition, and slander of title claims, but determined that "Ryan had raised a triable issue as to whether she is entitled to judgment against ELW for [contributory or vicarious] copyright infringement."[5] The Ninth Circuit also instructed that "[i]f the district court finds ELW liable for contributory or vicarious copyright infringement, it should consider whether Ryan is the prevailing party under the broad language of the contract, and whether she is entitled to a permanent injunction against ELW."[6] The case was then remanded for further consideration consistent with this disposition.

On April 7, 2011, the appellate court granted Ryan's motion to transfer to the district court consideration of attorney's fees on appeal. The appellate court noted in determining whether Ryan is entitled to any contractual or statutory attorney's fees, "the district court may take whatever action it deems appropriate."[7]

In light of the retirement of Judge Patricia V. Trumbull and the appointment of the undersigned, the case was reassigned.[8]

After the parties waived their right to a jury trial, these matters were tried to the court. Richard DeLiberty represented Ryan. Michael Painter represented ELW. The parties had previously consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

[3] See Docket No. 146.

[4] See Docket No. 180.

[5] Id. at 3.

[6] Id.at 5.

[7] See Docket No. 187.

[8] See Docket No. 190.

Case No.: C 06-4812 PSG
ORDER

Although both sides submitted proposed findings of fact and conclusions of law, the court has determined to make its own findings and reach its own conclusions rather than picking and choosing between their competing versions. That a proposed finding has not been adopted does not necessarily mean it has been rejected. It simply means that the court has determined that it is unnecessary either to adopt or reject it. The court does not find it necessary to cite to the record throughout this order and will do so only where it might prove particularly helpful for purposes of any appeal. To the extent this order identifies conclusions of law as findings of fact, or vice versa, it does so without prejudice to their proper consideration and treatment.

## II. FINDINGS OF FACT

The court heard testimony from Ryan, Joanne Chappell ("Chappell"), Todd Haile ("Haile"), and Barbara Vollmer ("Vollmer").

On balance, the court found Ryan's testimony to be credible.

The court found Chappell to be a somewhat less credible witness. She testified repeatedly that as the owner of ELW, she had no knowledge of the licensing agreements that ELW entered into with third parties such as ArtSelect. But deposition testimony from several ELW employees, including Michael Jakola, ELW's Chief Executive Officer from July 2004 through 2007, showed otherwise. Given this contradictory testimony, the court generally affords Chappell's testimony less weight.

The court found Haile to be a credible witness as to ELW's policies and relationships with artists, but notes that on cross-examination that Haile admitted he lacked knowledge regarding the company's specific license terms and conditions during the relevant time period. In addition, Haile had difficulty remembering specific conversations with Ryan, and needed documents to refresh his recollection.

Case No.: C 06-4812 PSG
ORDER

The court finds Vollmer to be a credible witness as to her communications with Ryan. Vollmer lacked knowledge, however, regarding ELW's canvas transfer policies.

Against this backdrop, the court makes the following specific findings of fact.

**A.      ELW and Ryan's Contract, and the Emergence of Canvas Transfers**

Ryan met Chappell in the 1980s. Chappell operated ELW and began selling Ryan's artwork in its gallery. Later ELW became a publisher of art posters.

On August 19, 1995, Ryan and ELW entered into a written contract wherein Ryan licensed ELW the exclusive right to publish, distribute and sell certain Ryan paintings as posters.[9] The contract refers only to posters and does not grant rights as to derivative works such as canvas transfers, giclees, or wall murals.

A canvas transfer is created by lifting the ink from a paper poster and remounting it onto a canvas. First, a chemical solution is applied to the poster. The poster is then adhered to a plastic carrier sheet that lifts the ink off the paper. The transfer sheet is then applied to a canvas. Canvas transfers have existed since the late 1980s, or early 1990s. They were not commonplace in the industry, however, when Ryan and ELW entered into their contract in 1995.

Similar to a canvas transfer, a giclée is a reproduction of an artwork, but it is created from a digital image of it. An ink jet printer prints the digital image either on canvas or paper. A giclée does not need to be the same size as the original poster. Giclées are generally of a higher quality than canvas transfers because the printer uses four ink colors and a continuous spray as opposed to the three ink colors and dot printing that are used for posters.

A wall mural is a large picture to be affixed to a wall.

Ryan and ELW's contract provides for attorney's fees for the prevailing party in any suit "with regard" to the contract. Section 12 of the contract states:

---

[9] Pl. Ex. 1 at 1.

4

Case No.: C 06-4812 PSG
ORDER

> In the event that litigation is instituted with regard to this Agreement, the prevailing party shall be entitled to its costs of the suit, including reasonable attorney's fees. [10]

In 2004, Ryan noticed canvas transfers of her posters for sale on the internet. Ryan contacted Haile to express her concern about such canvas transfers. No action was taken by either Ryan or ELW immediately following that conversation.

On November 9, 2004, Ryan sent an email to Haile once again expressing her concerns regarding canvas transfers. It states:

> I have been learning more about 'canvas transfers' and wonder what you think about the ethics of utilizing this method to market posters. I wonder if there is a legal or copyright issue here. I know of several companies that use this technology on my posters and others and it just doesn't sit too well to think that a new product is being made and no compensation is rendered to the artist. I'm curious to know your opinion on this issue. [11]

### B.    ELW's Policies Regarding Canvas Transfers

After 2004, canvas transfers became more prominent in the art publishing industry. Around that same time, ELW's catalogue and website began including a general policy prohibiting its customers from utilizing ELW posters in canvas transfers. [12] Customers had to obtain approval from ELW management before any artwork was reproduced as a canvas transfer. ELW salespeople understood that the artist's approval was required under ELW policy before ELW would authorize any canvas transfer of that artist's works. Typically, a salesperson would receive a customer inquiry and would then speak with, or email, Jakola or Chappell. They would respond within a few days. There was no file or central database at ELW for a salesperson to use to find out whether a specific artist had a policy with respect to canvas transfers. If an artist approved of a canvas transfer at a time other than when the agreement is signed, no information was recorded.

---

[10] Def. Exh. No. 201, ¶ 4.

[11] Pl. Exh. No. 9.

[12] *See* Pl. Exh. Nos. 10, 11.

5

Case No.: C 06-4812 PSG
ORDER

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Its general policy notwithstanding, ELW would regularly authorize canvas transfer without obtaining permission first from the artist and despite any authority provided by the artist's contract. With too many accounts and artists to keep track of them all, if an artist did not have a clause explicitly denying the right to canvas transfer, ELW would not impose such a restriction on canvas transfers.

**C.     ELW and Third-Party Agreements**

In 2005, ELW authorized ArtSelect to produce giclées of its artists' works. On April 4, 2005, ELW provided ArtSelect with a "go" list of artists approved to be a part of the giclée agreement. Jakola, Chappell, and Haile discussed which artists would be included on the list. Chappell represented to Jakola that she would contact the artists that she was unsure about approving for canvas transfers. Ryan was one such artist that Chappell agreed to contact, and Ryan's artworks, "Primavera I," "Primavera II," "Slow Journey," "Still Water," "Vineland I," "Vineland II" were part of the ELW-ArtSelect agreement.[13]   Chappell never contacted these artists, however, and never received approval for the giclée agreement.

In 2005, ELW also authorized ArtSelect to make canvas transfers from its posters for some of its artists and their works. ELW salesman Jeremy Conybeare ("Conybeare") provided ArtSelect with a specific list of artists approved for canvas transfers, including Ryan.[14] On May 2, 2005, ArtSelect sent ELW a revised list of artists whose works it wanted to use for canvas transfers. Conybeare approached Haile to confirm which artists had approved canvas transfers of their artwork. Conybeare contacted Haile because Chappell was often hard to find, and Haile was the person that had contact with the artists. ELW approved ArtSelect's list the next day.[15]

---

[13] *See* Pl. Exh. No. 12.

[14] *See* Pl. Exh. No. 15.

[15] *See* Pl. Exh. No. 16.

Case No.: C 06-4812 PSG
ORDER

1

2       ArtSelect did not offer canvas transfers of artists' works unless it had prior approval. If a

3  publisher advised ArtSelect that canvas transfers were authorized for a particular artist, ArtSelect

4  continued to assume approval until it was notified otherwise. ArtSelect itself never sought direct

5  authorization from artists before they produced canvas transfers. ArtSelect also did not endeavor to

6  confirm that a publisher, who represented that it has the rights to print particular artwork, actually

7  had those rights. It was reasonable for ArtSelect to rely on ELW's representations.

8       On May 27, 2005, ArtSelect sold a canvas transfer of Ryan's artwork, "Primavera I" for the

9  sale price of $98.96.[16] After ArtSelect placed the order, ELW shipped the poster directly to an

10  outside vendor named DeNunzio, Inc. ("DeNunzio") to complete the canvas transfer process. On

11  June 22, 2005, ArtSelect shipped the canvas transfer of "Primavera I" to its customer. On July 6,

12  2005, the customer returned the canvas transfer because he did not like it. The customer obtained a

13  full refund. Items returned to ArtSelect were placed in its outlet stock. On July 24, 2005, the outlet

14  re-sold the canvas transfer for $51.69 and it was shipped two days later.[17] After calculating all of

15  the costs, ArtSelect's profit on the sale of the canvas transfer was $1.72.[18]

16

17       On July 1, 2005, ELW entered into an agreement with Environmental Graphics / Murals

18  Your Way ("Environmental Graphics") to produce wall murals. ELW authorized Environmental

19  Graphics to create wall murals of all artists and images attached to the agreement "as agreed to by

20  Lisa Jerlstrom and Michael Jakola."[19] "Example A" was attached to the agreement and contains a

21  list of artists and images that ELW approved for the wall murals.[20] This list included Ryan and her

22

---

23  [16] *See* Pl. Exh. No. 18.

24  [17] *See* Pl. Exh. No. 19.

25  [18] *See* Pl. Exh. No. 18. ArtSelect's incurred a $29.42 dropship cost, a $1.42 box cost, a $7.13
    shipping cost, and a $12.00 handling cost, netting a total profit of $1.72 for the canvas transfer.

26

27  [19] Pl. Exh. No. 13.

28  [20] *See* Pl. Exh. No. 14.

7

Case No.: C 06-4812 PSG
ORDER

United States District Court
For the Northern District of California

works, including "Primavera I," "Primavera II," Slow Journey," "Still Water," "Vineland I," and "Vineland II." Environmental Graphics never sold, or produced any mural based on Ryan's work.

### D.   The Demise of the Ryan-ELW Relationship

Ryan's displeasure with ELW's practices reached a peak in early 2005. At the Sausalito Art Festival, Ryan expressed her anger and frustration that ELW was authorizing others to produce canvas transfers of her work.

On or around June 9, 2005, Haile[21] received a phone call from Ryan demanding that ELW immediately stop its customers from making canvas transfers of her work. Jakola was informed of the phone call, and Ryan's name was immediately removed from both the canvas transfer list and giclée agreement. Conybeare emailed ArtSelect, who immediately removed images of canvas transfers of Ryan's artwork from ArtSelect's website.[22] Also on June 9, Jakola emailed ArtSelect to remove Ryan from the giclée agreement, and ArtSelect did so the next day.[23] Despite these instructions, Ryan still found her artwork on other websites. She then retained counsel, who sent a cease and desist letter to ELW and sought an accounting for the sales of Ryan's artwork.[24] On February 8, 2006, ELW revised its agreement with Environmental Graphics and removed several artists from the parties' agreement, including Ryan.[25] After this suit was initiated, ELW terminated its relationship with Ryan and has not conducted any business with her whatsoever.

---

[21] Chappell testified that she received the phone call. Both Haile and Jakola testified that Haile received the phone call and relayed the information to both Chappell and Jakola. In light of this conflicting testimony, the court finds Haile and Jakola to be more credible, and that Haile in fact received the phone call.

[22] *See* Pl. Exh. No. 21.

[23] *See* Pl. Exh. No. 20.

[24] *See* Pl. Exh. No. 2.

[25] *See* Pl. Exh. 22.

8

Case No.: C 06-4812 PSG
ORDER

### III. CONCLUSIONS OF LAW

**A.      Claim 1: Contributory Copyright Infringement**

In order to show contributory infringement, Ryan must show that ELW knew or had reason to know of a third party's directly infringing activity, and substantially participated in that activity, such as by inducing, causing, or materially contributing to the infringing conduct, or by failing to take simple measures to prevent further damage to copyrighted works.[26] Three key cases have addressed liability under this standard: *Fonavisa*;[27] *Napster;*[28] and *Grokster.*[29] In *Fonovisa,* the Ninth Circuit held a swap meet operator contributorily liable for the sale of pirated works at the swap meet. In *Napster,* the Ninth Circuit held the operator of an electronic file sharing system liable when users of that system employed it to exchange massive quantities of copyrighted music. In *Grokster,* the Supreme Court found liability for the substantially similar act of distributing software that enabled exchange of copyrighted music on a peer-to-peer, rather than a centralized, basis.

**1.      Direct Infringement of Ryan's Works**

Anyone who violates any of the exclusive rights of the copyright owner is a direct infringer of the copyright of the author.[30] In order to present a prima facie case of direct copyright infringement, the copyright holder must (1) show ownership of the allegedly infringed material and

---

[26] *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 795 (9th Cir. 2007). *See also Metro Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936 (2005) (holding that a party is liable for contributory copyright infringement if the party intentionally induced or encouraged direct infringement through specific acts); *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020 (9th Cir. 2001).

[27] *Fonavisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996).

[28] *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001).

[29] *Metro-Golwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005).

[30] *See* 17 U.S.C. § 501(a).

Case No.: C 06-4812 PSG
ORDER

(2) demonstrate that the alleged infringers violated at least one exclusive right granted to the

copyright holder under 17 U.S.C. § 106.[31]

      Ryan has demonstrated ownership. She owned a valid copyright for each of her paintings

the moment they were completed, and fixed in the canvas. Ryan registered the original art relevant

to this copyright infringement action on October 28, 2005,[32] thereby allowing her to initiate the

present action.[33] ELW does not dispute the originality, or validity of Ryan's copyrighted works.

      Among other rights, a copyright owner has the exclusive rights to reproduce the

copyrighted work,[34] prepare derivative works based upon the copyrighted work,[35] and distribute

copies of the copyrighted work by sale or other transfer of ownership.[36] The contract between Ryan

and ELW granted ELW the exclusive rights to publish, distribute and sell poster editions of Ryan's

original works of authorship. Ryan thus divested herself of only a portion of her exclusive rights by

her contract and retained all other rights.

      When it created the canvas transfer, ArtSelect infringed Ryan's retained right to prepare

derivative works. [37]  A derivative work is

> a work based upon one or more preexisting works, such as a translation, musical
> arrangement, dramatization, fictionalization, motion picture version, sound
> recording, art reproduction, abridgment, condensation, or any other form in which a
> work may be recast, transformed, or adapted.

---

[31] *See A&M Records, Inc.*, 239 F.3d at 1013.

[32] *See* Def's. Exhs. 203 – 207.

[33] *See* 17 U.S.C. § 411(a).

[34] *See* 17 U.S.C. § 106(1).

[35] *See* 17 U.S.C. § 106(2).

[36] *See* 17 U.S.C. § 106(3).

[37] The reproduction right was not implicated. *See Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
856 F.2d 1341, 1344 (9th Cir. 1988) ("removing the individual images from the book and placing
them on tile, perhaps [does not] accomplish[] reproduction").

Case No.: C 06-4812 PSG
ORDER

In *Mirage Editions*, the Ninth Circuit has held that mounting a "preexisting, copyrighted individual art image[] without the consent of the copyright proprietors [constitutes] a derivative work and infringe[s] the subject copyrights."[38] The court held that when defendant mounted copyrighted notecards to tile they were sufficiently "transformed," thus rendering the tiles derivative works.[39] While this holding may have broad implications for copyright infringement by suggesting that art galleries, museums, or art collectors create a derivative work each time they change the frame on a painting or the matte of a photograph,[40] this court is bound by Ninth Circuit precedent. ArtSelect therefore prepared a derivative work and infringed Ryan's copyright when it prepared the canvas transfer of *Primavera I.*

There was no direct infringement by Environmental Graphics.[41] Because the only act of direct infringement proved at trial was the canvas transfer created by ArtSelect, ELW can be contributorily or vicariously liable only for that act.

### 2. ELW Had Knowledge of the Direct Infringement

ELW authorized ArtSelect to create canvas transfers from Ryan's posters. It did so at ArtSelect's specific request. ELW also received an invoice from ArtSelect reflecting that Ryan's poster was to be shipped to Denunizo,[42] who at the time created canvas transfers for ArtSelect

---

[38] *Mirage Editions*, 856 F.2d at 1343.

[39] *See id.*

[40] *See Lee v. A.R.T. Co.,* 125 F.3d 580, 582-83 (7th Cir. 1997) (explicitly rejecting *Mirage Editions* in finding that when the lithograph was bonded to the tile it was not changed in the process, and still depicts exactly the same artwork, and thus had not been recast, adapted, or transformed).

[41] While Section 106 grants the copyright holder the right to authorize the enumerated activities, courts have found this clause as contemplating liability for contributory infringement – not imposing direct liability for authorizing the activity. *See Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,* 24 F.3d 1088, 1093 (9th Cir. 1994).

[42] *See* Pl. Ex. 37.

11

Case No.: C 06-4812 PSG
ORDER

exclusively. Based on this uncontroverted evidence, ELW knew, at least constructively, of ArtSelect's direct infringement.[43]

### 3.  ELW Materially Contributed to the Direct Infringement

ELW supplied ArtSelect with Ryan's poster and authorized its use for canvas transfer. ELW provided this authorization at ArtSelect's specific request and even though its contract and communications with Ryan supplied no such authorization to ELW. Without the poster and ELW's authorization, ArtSelect would not have infringed Ryan's work. ELW thus materially contributed to the direct infringement.

Because both elements of a contributory infringement claim have been established, ELW is liable on this claim.

### B.    Claim 2: Vicarious Copyright Infringement

ELW is liable for vicarious copyright infringement if (1) ELW enjoyed a direct financial benefit from ArtSelect's infringing activity, and (2) ELW had the right and ability to supervise the infringing activity.[44] A vicarious infringer profits from direct infringement while declining to exercise a right to stop or limit it.[45] "A defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability

---

[43] *See A&M Records,* 239 F.3d at 1020. *See also, Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 727 (9th Cir. 2007) (quoting Restatement (Second) of Torts § 8A cmt. B (1965) ("the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result")).

[44] *See Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004); *Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 729 (9th Cir. 2007).

[45] *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005); *Range Rd. Music, Inc. v. E. Coasts Foods, Inc.,* 668 F.3d 1148, 1152-53 (9th Cir. 2012).

12

United States District Court
For the Northern District of California

1  to do so."[46] A financial benefit may exist under several circumstances, one of which is when "the

2  availability of infringing material acts as a draw for customers."[47]

3      Here, the profits – however modest – from the sale of the underlying poster establishes that

4  ELW enjoyed a financial benefit from ArtSelect's infringing activity and thus met the first element

5  for vicarious liability. But for the second element, the court is not persuaded that ELW had the

6  legal right to do so. Ryan introduced no contract or other means by which ELW could exercise

7  legal authority over ArtSelect and its actions.

8      Because both elements of a vicarious infringement claim have not been established, ELW's

9

10  is not liable on this claim.

11  **C.    No Damages Are Warranted**

12      While the Copyright Act provides for an award of damages upon a finding of infringement,

13  Ryan introduced no evidence to substantiate a claim to any portion of ELW's profits or any other

14  damages award here. Even though counsel references a damages award in his closing argument,

15  argument alone is not evidence.

16

17  **D.    Injunctive Relief in Favor of Ryan is Appropriate**

18      "Upon prevailing in a statutory copyright infringement action, [Ryan] may obtain, in

19  addition to monetary recovery, a permanent injunction restraining further infringement . . . . Such

20  injunctive relief ordinarily will not be granted when there is no probability or threat of continuing

21  or additional infringements."[48]

22

23  _____

24  [46] *Id.* at 730.

25  [47] *A&M Records,* 239 F.3d at 1023.

26  [48] *Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc.,* 367 F.2d 236, 242 (9th Cir. 1966). *See*

27  *also Sega Enters. Ltd. v. Maphia,* 948 F.Supp. 923, 940 (N.D. Cal. 1996) (finding that continued access to the equipment that allowed defendant to illegally download and distribute game programs constituted a threat of future copyright violations); *MAI Sys. Corp. v. Peak Computer, Inc.,* 991

28  F.2d 511, 520 (9th Cir. 1993) (finding that a computer servicing company that maintained

13

Case No.: C 06-4812 PSG
ORDER

The court may consider four factors in determining whether to issue a permanent injunction: (1) irreparable harm; (2) success on the merits; (3) a balancing of competing claims of injury to the parties; and (4) consideration of the public interest.[49]

The elements required for issuing a permanent injunction are satisfied here. Evidence of copyright infringement, as has been established here, is presumed to give rise to irreparable harm.[50] Ryan also has adequately demonstrated that she will suffer irreparable harm if ELW is not permanently enjoined. Its published policy notwithstanding and despite explicit instructions from Ryan to the contrary, ELW authorized others to prepare derivative works of Ryan's artwork. While Chappell testified that ELW ceased conducting business with Ryan in 2005, ELW has not terminated or repudiated its contract with Ryan, and the court is not persuaded in light of her overall lack of credibility that this pledge is sufficient to avoid any probability or threat of infringement in the future.[51] The court also cannot discern any detriment to ELW that would outweigh the harm to Ryan if an injunction were issued.

The public interest also weighs in favor of granting a permanent injunction in this case. Injunctions issued pursuant to Section 502 of the Copyright Act serve the public interest by upholding copyright protections.[52] As noted by the Third Circuit, "the public interest can only be served by upholding copyright protections and . . . preventing the misappropriation of skills,

---

computers in its inventory with protected software presented a threat of future copyright violations and warranted an injunction).

[49] *See Sony Music Entertainment, Inc. v. Global Arts Productions,* 45 F.Supp.2d 1345, 1347 (S.D. Fla. 1999).

[50] *See Elektra Entm't Group Inc. v. Bryant,* No. CV 03-6381 GAF (JTLX), 2004 WL 783123, at *17 (C.D. Cal. Feb. 13, 2004); *see also Micro Star v. Formgen Inc.,* 154 F.3d 1107, 1109 (9th Cir. 1998) ("[I]n a copyright infringement claim, a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm").

[51] *Cf. MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 520 (9th Cir. 1993).

[52] *See Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476, 1499 (10th Cir. 1993).

14

Case No.: C 06-4812 PSG
ORDER

United States District Court
For the Northern District of California

creative energies, and resources which are invested in the protected work."[53] Accordingly, the court finds that permanent injunctive relief is appropriate in this case.

Rule 65 of the Federal Rules of Civil Procedure requires that "[e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail . . . the act or acts sought to be restrained . . ."[54] Generally, "an injunction must be narrowly tailored to remedy only the specific harms shown by plaintiffs rather than to enjoin all possible breaches of the law."[55] To avoid the threat of continuing or additional infringements, the court finds it appropriate to enter injunctive relief in Ryan's favor as follows:

> ELW shall be and is hereby enjoined from directly or indirectly infringing Ryan's rights under federal or state law in any copyrighted work, whether now in existence or later created, that is owned or controlled by Ryan, except pursuant to a lawful license or with express authority of Ryan.

### E.   An Award of Attorney's Fees in Ryan's Favor is Appropriate

As the Ninth Circuit has noted, the "broad" language Ryan's contract authorizes an award of "the costs of the suit, including reasonable attorney's fees" to "the prevailing party" if "litigation is instituted with regard to this Agreement."  This language requires an appropriate evaluation of whether Ryan has indeed prevailed in litigation with regard to this Agreement. California law, the operative law of the agreement, provides that "[i]n determining litigation success for the purposes of identifying a prevailing party as defined by a contract, courts should respect substance rather than form, and to this extent should be guided by equitable considerations."[56]  Even though ELW prevailed on Ryan's claims under the contract itself, as well as other claims, the "with regard to this

---

[53] *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3rd Cir. 1983).

[54] Fed. R. Civ. P. 65(d).

[55] *Iconix, Inc. v. Tokuda,* 457 F.Supp.2d 969, 998-1002 (N.D. Cal. 2006) (citing *Price v. City of Stockton,* 390 F.3d 1105, 1117 (9th Cir. 2004)).

[56] *See Hsu v. Abbara,* 9 Cal. 4th 863, 877 (1995).

Case No.: C 06-4812 PSG
ORDER

Agreement" clause defines the appropriate scope of litigation to be considered in determining the prevailing party more expansively than just the contract claims alone. This scope includes at least claims such as those presented here, where ELW relied on the contract – incorrectly – to justify its representation to others that nothing prevented them from preparing derivatives of Ryan's copyrighted works.

As noted above, the court has found in favor of Ryan on the contributory copyright infringement claim and in favor of ELW on the claims for breach of contract, slander of title, unfair competition, and vicarious copyright infringement claims. The court found only one instance of copyright infringement but no proof of any damages. Moreover, the court determined that statutory damages and attorney's fees are not available to Ryan under the copyright infringement claim. The court nonetheless concluded, however, that a permanent injunction was warranted in Ryan's favor. Viewing the prevailing party clause appropriately, and considering Ryan's litigation success, both in substance and form, the court finds that an apportionment limiting Ryan to only reasonable attorney's fees and costs incurred in prosecuting her contributory infringement claim is appropriate.

**IV.    CONCLUSION**

A permanent injunction and an award of attorney's fees and costs is warranted as specified above. No later than July 16, 2012, Ryan shall file a declaration setting forth the attorney's fees she incurred in prosecuting the claim for contributory copyright infringement. The court, however, will entertain a brief from ELW in opposition no later than July 30, 2012 and will apply an appropriate, exacting standard to exclude any fees and costs unrelated to Ryan's successful pursuit of her copyright claim.

Case No.: C 06-4812 PSG
ORDER

**IT IS SO ORDERED.**

Dated:   7/2/2012

_____
PAUL S. GREWAL
United States Magistrate Judge

Case No.: C 06-4812 PSG
ORDER